<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| V.R.,<br><br>　　　　　　Plaintiff,<br><br>　　　　v.<br><br>BERGEN COUNTY PROSECUTOR'S OFFICE<br>*et al.*,<br><br>　　　　　　Defendants. | No. 23cv20605 (EP) (LDW)<br><br>**OPINION** |

**PADIN, District Judge.**

This case presents a tragic set of facts.  After Plaintiff, V.R., a minor at the time of the events at issue, was allegedly sexually groomed and abused by students at her high school and by non-party Nicolas Coirazza, Coirazza murdered Plaintiff's mother in Plaintiff's own home. Plaintiff sues three Defendants: Bergen County Prosecutor's Office ("BCPO"), Cresskill Public Schools ("CPS"), and the Borough of Cresskill (the "Borough") (collectively, "Defendants").  D.E. 20 ("Am. Compl." or "Amended Complaint").  The claims include violations of Plaintiff's rights under the Federal and New Jersey State constitutions, a violation of Title IX of the Education Amendments of 1972[1] ("Title IX"), negligence, and a violation of New Jersey's Child Sexual Abuse Act[2] (the "CSAA").[3]

---

[1] 20 U.S.C. § 1681(a).

[2] N.J.S.A. 2A:61B-1.

[3] Although the parties do not dispute this Court's jurisdiction over the state law claims, the Court has an independent duty to determine its own subject matter jurisdiction.  *See New Jersey Carpenters and the Trustees Thereof v. Trishman Const. Corp. of New Jersey*, 760 F.3d 297, 302 (3d Cir. 2014).  The Court is satisfied that it has supplemental jurisdiction over the state law claims because they are "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367.

BCPO moves to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).  D.E. 52-1 ("BCPO Mot.").  CPS and the Borough each move to dismiss for failure to state a claim pursuant to Rule 12(b)(6).[4]  D.E. 41-19 ("CPS Mot."); D.E. 49-1 ("Borough Mot.").  The Court decides the motions without oral argument.  *See* Fed. R. Civ. P. 78(b); L.Civ.R.78(b).  For the reasons set forth below, BCPO's motion will be **GRANTED**; the Borough's motion will be **GRANTED**, ***in part***, **and DENIED**, ***in part***, and CPS's motion will be **GRANTED**, ***in part***, **and DENIED**, ***in part***.

# I.     BACKGROUND[5]

## A.     The Grooming of Plaintiff

This horrible story began when Plaintiff was just thirteen years old, attending Cresskill High School ("CHS").[6]  Am. Compl. ¶¶ 6, 12.  A ninth grade student led a pervasive "Satanic cult" at CHS, in which she groomed a number of minor girls, including Plaintiff, for sexual relationships with an adult male—Coirazza.  *Id.* ¶¶ 12, 60.  Coirazza exploited Plaintiff's young age and difficult family relationship, making her psychologically and emotionally dependent on him.  *Id.* ¶ 14.  As an adult, Coirazza engaged in a sexual relationship with Plaintiff when she was just thirteen years old.  *Id.* ¶¶ 12, 16.  This sexual relationship manifested in various forms, including inappropriate social media messages, a video of Coirazza masturbating he sent to Plaintiff, and Coirazza providing Plaintiff with marijuana in return for sex.  *Id.* ¶¶ 15, 16, 27.

---

[4] The Borough puzzlingly titles its motion as a motion for "judgment on the pleadings."  However, the Borough seeks relief under Rule 12(b)(6).  Therefore, the Court will construe the Borough's motion as seeking dismissal for failure to state a claim under Rule 12(b)(6).

[5] The facts in this section are taken from the well-pled factual allegations in the Amended Complaint, which the Court presumes to be true for purposes of resolving the motions to dismiss.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[6] CHS is among the four schools that comprise CPS.  Am. Compl. ¶ 9.

"[E]gged on" by her peers at CHS, Plaintiff "became entangled in Coirazza's perverse web." *Id.* ¶¶ 51, 60-61. Plaintiff began showing signs of depression and her grades began to plummet, resulting in the failure of several classes despite her academic success before the grooming. *Id.* ¶¶ 61-62. Plaintiff's relationships at home also suffered as a result of her grooming at school and her relationship with Coirazza. Her relationship with her mother, Divna, became strained with frequent arguments. *Id.* ¶ 63. As Plaintiff's family became increasingly concerned with her relationship with Coirazza, he persuaded Plaintiff to "turn against her family"—resulting in Plaintiff not speaking to her brother for two years. *Id.* ¶ 18.

**B.    Plaintiff's Parents Report the Relationship and Messages Between Plaintiff and Coirazza to CHS and CPD, To No Avail**

Plaintiff's parents relayed their concerns of Plaintiff's abuse to CHS and the Cresskill Police Department ("CPD")[7]. *Id.* ¶ 20. Divna first reported her concerns to CHS, but CHS did not conduct any investigation or intervention—instead referring Divna to the police. *Id.* ¶¶ 21-22. Plaintiff's family nevertheless repeatedly contacted CPS officials, including the CHS principle, to report their concerns about the exploitation of Plaintiff and other young girls attending CHS. *Id.* ¶¶ 52-54.

Plaintiff's parents then turned to CPD, reporting inappropriate behavior involving Coirazza more than six times. *Id.* ¶¶ 23, 26. However, CPD was non-responsive. *Id.* ¶ 23. As Divna began reporting the pattern of abuse to the police, CPD resolved to ignore her, labeling her as a "hysterical woman," telling her that she "needed go get psychiatric help," and did not pursue an investigation. *Id.* ¶¶ 24-25, 36. This despite Plaintiff's parents providing CPD with the explicit video Coirazza sent to Plaintiff which showed him masturbating. *Id.* ¶ 28.

---

[7] CPD is located within the Borough of Cresskill. *See Police Department Information*, Borough of Cresskill, https://perma.cc/QK6B-UHQ5 (last visited May 23, 2024).

CPD's actions were limited to CPD Detective John Birnie telling Plaintiff's father, Victor, that CPD would contact the police department in Coirazza's hometown, the Lodi police department ("LPD"), and that LPD would "put the fear of God into him" to dissuade him from continuing his relationship with Plaintiff. *Id.* ¶ 29. However, when LPD contacted Coirazza, he told a detective that he had not been in contact with Plaintiff for over two months—no further investigation was conducted by LPD. *Id.* ¶¶ 30-31.

While Plaintiff's parents were still attempting to secure police intervention, around May 2020, Victor spoke with a CPD captain to follow up on his complaints. *Id.* ¶ 44. However, the captain did not provide Victor with any information and told Victor that he had been ordered by his superior officers not to speak with Victor or Divna. *Id.*

### C.    Coirazza Murders Plaintiff's Mother, Divna

On the morning of June 14, 2020, Plaintiff, who was fourteen at this point, had an argument with her mother, Divna, after Divna confiscated Plaintiff's phone in an attempt to stop her conversations with Coirazza, who was nineteen years old at the time. *Id.* ¶¶ 64, 67. Unbeknownst to Divna, Coirazza had snuck into her house earlier and was hiding in Plaintiff's bedroom while Divna and Plaintiff argued outside the house. *Id.* ¶ 65. When Divna went back into the house, Coirazza revealed himself and attacked Divna, throwing her down a flight of stairs and stabbing her 55 times with a knife, killing her, while Plaintiff was outside. *Id.* ¶ 66.

Coirazza then let Plaintiff into the house and showed Plaintiff her mother's body. *Id.* ¶ 68. While Plaintiff was "in shock and hysterical," Coirazza convinced her to help him dispose of her mother's body. *Id.* ¶¶ 68-69. Plaintiff believed that if she did not help Coirazza, he would harm her as well, and that, given the history of police inaction, reporting him to the police would neither protect her nor stop Coirazza. *Id.* ¶¶ 71-72. At Coirazza's direction, Plaintiff falsely told her father that Divna had driven off alone when, in fact, Coirazza had taken Divna's car to buy supplies to

4

aid in the disposal of her body. *Id.* ¶ 70. That night, Coirazza and Plaintiff were discovered together in an Uber after disposing of Divna's body. *Id.* ¶ 74. Coirazza had a hotel room key and a murder weapon in his possession at the time. *Id.* ¶ 75.

### D. Plaintiff's Interrogation

Plaintiff and Coirazza were taken in for questioning by CPD and BCPO. *Id.* ¶¶ 75, 78, 79. Then, Plaintiff's father, Victor, arrived at the police station after finding his wife missing. *Id.* ¶¶ 78, 81. However, it was "multiple hours" before Victor was informed that his daughter had been found with Coirazza or that his wife had been murdered. *Id.* ¶¶ 78, 81. Instead, investigators pretended to have just discovered the fact that Divna had been murdered hours after they had learned that truth. *Id.* ¶ 81. The police also told Victor that they did not know whether his daughter was involved despite already treating her as a suspect. *Id.* ¶ 85, 88.

After learning that his wife had been murdered, Victor became "distraught" and was left alone in an empty room. *Id.* ¶¶ 82-83. Victor wandered around the room "tearfully muttering out loud, 'This is [expletive] beyond me' and asking . . . 'What happened? What happened?'" *Id.* ¶ 83. Visibly distraught," Victor told a detective that he felt "overwhelmed." *Id.*

The police then asked Victor for permission to interview Plaintiff. *Id.* ¶ 88. However, the police did not inform Victor that Plaintiff was a suspect—at this time, Victor only knew that his daughter was recovered after being kidnapped by Coirazza, and that Divna was dead. *Id.* Still, Victor immediately invoked Plaintiff's rights, including her right to have an attorney present. *Id.* ¶ 89. He explained to investigators, "I just need to find out a little more what's (sic) happening, my head is spinning." *Id.*

Victor was "distraught, in shock, and heavily sleep-deprived." *Id.* ¶ 90. Despite invoking his daughter's right to have an attorney present and indicating that he would allow his daughter to be interviewed soon, with an attorney, the investigators continued to push Victor into allowing a

detective to speak to his daughter without an attorney. *Id.* ¶¶ 90-91. Investigators ultimately told Victor that his daughter would not be able to go home unless she waived her right to have an attorney present during questioning and agreed to speak with them immediately. *Id.* ¶ 94.

Victor relented. He repeated to Plaintiff what investigators told him—that she would not be able to leave unless she spoke with investigators immediately, without an attorney present. *Id.* ¶ 95. Plaintiff, "traumatized" and "still grieving and sleep-deprived," was "desperate" to return home and she signed a *Miranda* waiver at her father's instruction, agreeing to be interviewed. *Id.* About a half hour into the interview, Victor realized that the police were, in fact, interrogating Plaintiff as a suspect in Divna's murder— he immediately stopped the interview. *Id.* ¶ 97.

### E.   Coirazza's Prosecution and Aftermath

Coirazza was charged with several crimes, including murder in the first degree, disturbing and desecrating human remains, tampering with physical evidence, and possession of a weapon for an unlawful purpose. *Id.* ¶ 98. Notably absent were any charges relating to his abuse of Plaintiff. *Id.* ¶ 101-02, 105. Coirazza ultimately pled guilty to Divna's murder and desecration of her body and was sentenced to fifty years' imprisonment for Divna's murder and eight years' imprisonment for the desecration of Divna's body. *Id.* ¶ 99.

Following Divna's death, Victor created a GoFundMe page where he alluded to the dangers of social media that led to his wife's death and sought to raise awareness of the risk of social media predation. *Id.* ¶¶ 106-07. Two individuals posted on the GoFundMe page, confirming that they had witnessed Coirazza openly grooming Plaintiff into a sexual relationship. *Id.* ¶ 110. Additionally, a letter from another individual set forth details about Coirazza, such as a history with illegal drugs, his ownership of a number of folding knives and pocketknives, and confirmed that this individual was aware that "[a] girl" introduced Coirazza to Plaintiff. *Id.* ¶ 111. These

statements were provided to law enforcement, but the CPD did not investigate them.  *Id.* ¶¶ 112.
To date, Coirazza has not been charged with any crimes related to his abuse of Plaintiff.  *Id.* ¶ 101.

      **F.**    **This Case**

      Plaintiff's father, Victor, filed an initial complaint on behalf of his daughter, V.R., on
September 22, 2023.  D.E. 1.  The Complaint initially named CPD, CPS, and the Borough as
defendants and asserted the same causes of action as are asserted in the Amended Complaint except
for the CSAA claim, which was not included in the original Complaint.  *Id.*  After determining that
Victor lacked standing to sue on behalf of his daughter, who had since turned 18, the Complaint
was amended to be on behalf of V.R. herself, along with adding the BCPO as a defendant, adding
the CSAA claim, and amending the Title IX and Fifth Amendment claims.  D.E.s 13, 20.

      Now BCPO moves to dismiss the Amended Complaint for lack of subject matter
jurisdiction pursuant to Rule 12(b)(1) and for failure to state a claim pursuant to Rule 12(b)(6).
BCPO Mot.  CPS and the Borough each move to dismiss the Amended Complaint pursuant to
Rule 12(b)(6).  CPS Mot.; Borough Mot.

**II.**    **LEGAL STANDARD**

      **A.**    **Federal Rule of Civil Procedure 12(b)(1)**

      A motion to dismiss under Fed. R. Civ. P. 12(b)(1) challenges the subject matter
jurisdiction of the court.  Fed. R. Civ. P. 12(1).  Under Rule 12(b)(1), "a court must grant a motion
to dismiss if it lacks subject matter jurisdiction to hear a claim."  *In re Schering Plough Corp.
Intron/Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) ("*Temodar*"); *see* Fed.
R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction,
the court must dismiss the action.").

      A 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is considered a "facial
challenge" when it "attacks the complaint on its face without contesting its alleged facts."  *Hartig*

*Drug Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016).  If a defendant brings a Rule 12(b)(1) motion before answering the complaint or "otherwise present[ing] competing facts," the Rule 12(b)(1) motion is, "by definition, a facial attack."  *Const. Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (citation omitted).  When reviewing a facial attack, the court "must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff."  *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (first citing *Mortensen v. First Fed. Sav. And Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977); then citing *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993)).

### B.   Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) permits the dismissal of a case for failure to state a claim.  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss for failure to state a claim, the reviewing court accepts all well-pled facts as true, construes the complaint in the plaintiff's favor, and determines "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks and citation omitted).  To survive a Rule 12(b)(6) challenge, the plaintiff's claims must be facially plausible, meaning that the well-pled facts "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The allegations must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Finally, "[i]n deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."  *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).

## III.    ANALYSIS

### A.  BCBO's Motion Will Be Granted

The Amended Complaint asserts federal and state constitutional claims against BCPO. Am. Compl. ¶¶ 117-22, 130-39.  BCPO argues (1) the Court lacks subject matter jurisdiction over the claims against it because it has Eleventh Amendment immunity; and (2) Plaintiff fails to state a claim against it under Rule 12(b)(6).  *See generally* BCPO Mot.  The Court finds that BCPO is immune from suit under the Eleventh Amendment and, therefore, that it lacks subject matter jurisdiction over all claims against BCPO.

"When a motion under Rule 12 is based on more than one ground, the court should consider the 12(b)(1) challenge first because if it must dismiss the complaint for lack of subject matter jurisdiction, all other defenses and objections become moot."  *Dickerson v. Bank of Am., N.A.*, No. 12-cv-3922, 2013 WL 1163483, at *1 (D.N.J. Mar. 19, 2013) (quoting *In re Corestates Trust Fee Litig.*, 837 F. Supp. 104, 105 (E.D. Pa. 1993), *aff'd* 39 F.3d 61 (3d Cir. 1994)).

The BCPO's Eleventh Amendment argument is a facial attack to the Court's subject matter jurisdiction.  *See Garcia v. Knapp*, No. 2:19-cv-17946, 2020 WL 2786930, at *4 (D.N.J. May 29, 2020); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 693 n.2 (3d Cir. 1996) ("[T]he Eleventh Amendment is a jurisdictional bar which deprives federal courts of subject matter jurisdiction."). The Eleventh Amendment protects non-consenting states and their agencies or instrumentalities— when acting as "arm[s] of the state"—from lawsuits brought by private citizens in federal court where monetary damages are sought.  *Regents of the University of California v. Doe*, 519 U.S. 425, 429-30 (1997); *see Pennhurst State School and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

Since there is no dispute that the Amended Complaint only seeks monetary damages from BCPO, whether the Eleventh Amendment applies to the claims against BCPO boils down to whether it was acting as an "arm of the state."  *Regents of the University of California*, 519 U.S.

9

425, at 429-30.  The Third Circuit has identified three factors courts must weigh when determining whether an entity is an arm of the state for purposes of Eleventh Amendment immunity: (1) "whether the money that would pay the judgment would come from the state," including "whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts"; (2) "[t]he status of the agency under state law," including "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation"; and (3) "what degree of autonomy the agency has."  *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989).  No one factor is determinative or of greater weight than the others—courts balance all three factors in a "holistic analysis."  *Karns v. Shanahan*, 879 F.3d 504, 515 (3d Cir. 2018).

Plaintiff argues that BCPO did not act as an arm of the state, but rather acted as a county-level entity with a high level of autonomy from the state.  *See* D.E. 60 ("Opp'n to BCPO Mot.") at 9-14.  However, even county prosecutors, such as BCPO, are entitled to immunity when exercising state power.  *See Est. of Lagano v. BCPO*, 769 F.3d 850, 857 (3d Cir. 2014).  Courts have "routinely held that county prosecutors, when pursuing their core functions, are entitled to Eleventh Amendment immunity."  *Est. of Bardzell v. Gomperts*, 515 F. Supp. 3d 256, 267-68 (D.N.J. 2021), *aff'd*, No. 21-1906, 2022 WL 843483 (3d Cir. Mar. 22, 2022); *see also Ong v. Sup. Ct. of Hudson Cnty.*, No. 16-cv-06777, 2018 WL 324722, at *5 (D.N.J. Jan. 8, 2018), *aff'd*, 760 F. App'x 133 (3d Cir. 2018) ("County Prosecutor's Offices in New Jersey . . . when performing their law enforcement functions, have regularly been held to be acting as arms of the State for Eleventh Amendment purposes.").  An analysis of the *Fitchik* factors here confirms that, as alleged, the BCPO acted as an arm of the state.

10

*First*, it is undisputed that the State of New Jersey would be responsible for paying a judgment entered against BCPO.  Opp'n to BCPO Mot. at 9.  Indeed, the New Jersey Supreme Court has ruled that when county prosecutors act in their law enforcement or investigatory capacities, "they act as 'agents' and 'officers' of the State, qualifying as State employees under N.J.S.A. 59:1-3 for the purpose of determining vicarious liability under the TCA."  *Wright v. State*, 169 N.J. 422, 452 (2001).  The Amended Complaint does not allege any actions taken by BCPO that fall outside of a law enforcement or investigatory capacity.  The relevant allegations all relate to the interrogation of a suspect in connection with BCPO's charging decisions.  Therefore, the first *Fitchik* factor is satisfied.

*Second*, Plaintiff argues that BCPO's status here is more akin to a county entity than a state entity.  However, "[t]he office of county prosecutor in the State of New Jersey is a constitutionally established office."  *Wright*, 169 N.J. at 437 (quoting *Coleman v. Kaye*, 87 F.3d 1491, 1500 (3d Cir. 1996), *cert. denied*, 519 U.S. 1084 (1997)); *see* N.J. Const. Art. VII, § 2, ¶ 1.  BCPO's status as a "constitutionally established office" satisfies the second *Fitchik* factor.  *See Bardzell*, 515 F. Supp. 3d at 269.

*Third*, Plaintiff argues that BCPO acted autonomously from the state.  Opp'n to BCPO Mot. at 13-14.  It is true that prosecutors enjoy a certain amount of independence and lack of day-to-day oversight.  However, New Jersey's Attorney General "has the ultimate responsibility in matters related to the enforcement of the State's criminal laws that have been legislatively delegated to county prosecutors."  *Wright*, 169 N.J. at 455 (citing N.J.S.A. 52:17B-98; N.J.S.A. 52:17B-103).  As such, where a prosecutor's actions involve the enforcement of the criminal law, it does not have autonomy from the state government.  *See id.*  Therefore, the third *Fitchik* factor is satisfied.  Because the Court finds that the *Fitchik* factors weigh in favor of finding that BCPO

is an arm of the state, it is immune from suit under the Eleventh Amendment and the Court lacks jurisdiction over claims against it.[8]  The Amended Complaint in its entirety will be **DISMISSED** ***without prejudice*** as to BCPO.

**B.      The Borough's Motion Will Be Granted, in Part, and Denied, in Part**

The Amended Complaint alleges that the Borough violated the federal and state constitutions, Am. Compl. ¶¶ 117-22, 130-39, was negligent, *id.* ¶¶ 140-44, and violated the CSAA, *id.* ¶¶ 145-59.  The Borough argues that the federal and state constitutional claims and the CSAA claim fail to state claims and that the negligence claim should be dismissed because Plaintiff failed to comply with the New Jersey Tort Claims Act.  The Court finds that Plaintiff fails to state claims against the Borough for all claims except negligence.

*1.      The federal constitutional claims, Counts I and III, will be dismissed as to the Borough*

There are two counts that appear to assert federal constitutional claims against the Borough: Count I asserts a violation of Section 1983, with unspecified underlying constitutional violations, and Count III asserts a violation of Plaintiff's Fifth Amendment rights.  Am. Compl. ¶¶ 117-22, 130-39.  As a preliminary matter, Section 1983 is the relevant statute that creates a private right of action for damages based on federal constitutional violations by state actors.  *See Manuel v. City of Joliet,* 580 U.S. 357, 362 (2017) ("Section 1983 creates a species of tort liability for the deprivation of any rights, privileges, or immunities secured by the Constitution.") (cleaned up).  As such, the Court will construe Counts I and III of the Amended Complaint as asserting

---

[8] Because the Court lacks jurisdiction over claims against BCPO, it does not analyze whether Plaintiff fails to state a claim as to BCPO.

constitutional claims pursuant to Section 1983.  *See Phillips*, 515 F.3d at 233 (holding that courts should "construe the complaint in the light most favorable to the plaintiff").[9]

### a.   Count I

Construing the Amended Complaint liberally, Count I appears to allege that a due process violation under the Fourteenth Amendment occurred when CPD did not investigate the complaints of abuse raised by Plaintiff's parents.  *See* Am. Compl. ¶¶ 117-22.  The Borough argues that Count I fails because the Borough cannot be liable for the conduct of its employees under the doctrine of *respondeat superior* and because the Amended Complaint does not adequately allege the actions that make up the alleged constitutional violation were taken pursuant to an official policy or custom.  Borough Mot. at 13-15.  The Borough also argues, albeit in passing, that Plaintiff fails to plead a specific constitutional violation.  *Id.* at 15.  The Court finds that Plaintiff has failed to allege an underlying constitutional claim in Count I.

Section 1983 provides only a *mechanism* for enforcing individual rights secured by constitution and laws of the United States—it is not an independent source of rights.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("One cannot go into court and claim a violation of § 1983—for § 1983 by itself does not protect anyone against anything.") (cleaned up).  With respect to a substantive due process claim, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989).  Because the Due Process Clause acts as a limitation on a state's power to act, "it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen

---

[9] Should Plaintiff file a Second Amended Complaint, she should specify the statutes that give rise to the causes of actions alleged and the specific underlying constitutional amendments that supply the substantive rights claimed.

to provide them." *Id.* at 196-97.  Thus, under *DeShaney*, a plaintiff does not have a substantive due process right to police intervention.  *See Burella v. Philadelphia*, 501 F.3d 134, 141 (3d Cir. 2007).

With respect to a procedural due process claim, absent a clear statement of legislative intent to the contrary, the police have significant discretion in carrying out their duties.  *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005) (discussing the "deep-rooted nature of law-enforcement discretion").  State law must "truly ma[ke] such enforcement *mandatory*" for a procedural due process claim to arise based on the lack of enforcement.  *Id.* at 760; *see also Burella*, 501 F.3d at 144.  Additionally, even if state law made such enforcement mandatory, it would also need to entitle Plaintiff to enforce the mandate.  *See Castle Rock*, 545 U.S. at 764-65; *Burella*, 501 F.3d at 144.

This discretion extends even when the police receive complaints that indicate grave imminent danger to minors.  The "horrible" facts of *Castle Rock* are illustrative.  *Castle Rock*, 545 U.S. at 751.  In *Castle Rock*, the plaintiff's husband abducted his three young daughters (ages 10, 9, and 7).  *Id.* at 752-53.  Plaintiff had a temporary restraining order ("TRO") against her husband which required that he stay away from the family home.  *Id.* at 751.  She called the police, reported the abduction, and showed the police a copy of the TRO.  *Id.* at 753.  However, the police told her there was nothing they could do.  *Id.*  Plaintiff called the police again, repeatedly, but the police refused to act.  *Id.* at 753-54.  Plaintiff sued the City of Castle Rock, amongst others, for failing to enforce the order of protection.  *Id.* at 751.  However, the Supreme Court found that no procedural due process claim existed because, despite a Colorado law stating that restraining orders shall be enforced, such enforcement was not "mandatory" for due process purposes and that the statute did not entitle plaintiff to enforce it.  *Id.* at 760, 764-65.

14

Here, Plaintiff has not shown the existence of a state law that shows a clear legislative intent that the police were required to investigate her parents' complaints. The Court in no way condones CPD's alleged failure to act when presented with complaints of sexual grooming and predation of a young girl. The police may have a moral responsibility to protect their community from such dangers. However, that responsibility alone does not create a constitutional violation under binding Supreme Court and Third Circuit precedent. Therefore, Count I will be **DISMISSED** *without prejudice*.[10] Plaintiff may file a Second Amended Complaint to assert the requisite legislative intent for a procedural due process violation if it exists.

b.      *Count III*

Count III alleges that the Borough violated Plaintiff's right against self-incrimination under the Fifth Amendment. Am. Compl. ¶¶ 130-39. The Borough argues that Count III fails because the Fifth Amendment only applies to federal actors, and it is not a federal actor. Borough Mot. at 16. Plaintiff responds that the self-incrimination clause in the Fifth Amendment applies to states through the Due Process Clause of the Fourteenth Amendment and that it adequately alleges Plaintiff's Fifth Amendment rights were violated. D.E. 54 ("Opp'n to Borough Mot.") at 13-16.

The Court agrees with Plaintiff that the self-incrimination clause of the Fifth Amendment is incorporated against the states under the Fourteenth Amendment. *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964). Therefore, the Court interprets Count III as asserting a violation of the Fifth Amendment's self-incrimination clause through the Fourteenth Amendment. However, Count III must nevertheless be dismissed. A municipality, such as the Borough, cannot be held liable for a violation of civil rights based solely on a theory of *respondeat superior*. *See Monell v. Dep't of*

---

[10] Because no underlying constitutional violation has been plead in Count I, the Court will not consider whether Plaintiff has adequately plead that a policy or custom caused the violation.

*Soc. Servs. of New York.*, 436 U.S. 658, 691 (1978).  Rather, a claim lies only when alleged constitutional violations are taken pursuant to the government's official policy or custom.  *See id.*; *Montgomery v. De Simone*, 159 F.3d 120, 126 (3d Cir. 1998).  Moreover, such policy or custom must be the "moving force" behind the alleged injury.  *Monell*, 436 U.S. at 694.  A policy is established when a "decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict."  *Beck v. Pittsburgh*, 89 F.3d 966, 972 (3d Cir. 1996) (cleaned up).  A custom is established when a "course of conduct" by state officials, "though not authorized by law," is "so permanent and well-settled as to virtually constitute law" or where there is "evidence of knowledge and acquiescence."  *Id.* (cleaned up).

Here, the closest thing to a policy or custom alleged by the Amended Complaint is the CPD's failure to investigate Plaintiff's parents' complaints—not in connection to a Fifth Amendment self-incrimination clause violation.  *E.g.*, Am. Compl. ¶ 43 ("The captain replied that he had been ordered by his superior officers not to talk to Victor or his wife.")  Because the Amended Complaint does not allege a policy or custom giving rise to the alleged Fifth Amendment violation, it fails to state a Fifth Amendment violation under Section 1983.  Therefore, Count III will be **DISMISSED** ***without prejudice***.  Plaintiff may file a Second Amended Complaint to assert such policy or custom if it exists.

> 2. *The New Jersey constitutional claim, Count IV, will be dismissed as to the Borough*

Count IV of the Amended Complaint alleges that the Borough violated the Victim Rights Amendment of the New Jersey Constitution, N.J. Const. Art. I § 22 (the "VRA").  Am. Compl. ¶¶ 134-39.  The Borough argues the claim should be dismissed because (1) Plaintiff did not identify the New Jersey Civil Rights Act ("NJCRA") as the statute providing the cause of action, and (2) Plaintiff is not a "victim" within the meaning of the VRA.  The Court construes the Amended

16

Complaint as bringing the constitutional claim pursuant to the NJCRA and finds that Plaintiff falls within the definition of "victim" in the VRA.[11]

The NJCRA is the relevant statute that creates a private right of action for damages based on violations of the New Jersey Constitution. *See Martin v. Unknown U.S. Marshalls*, 965 F. Supp. 2d 502, 548 (D.N.J. 2013) ("[C]ivil claims for violations of the New Jersey Constitution can only be asserted by way of the New Jersey Civil Rights Act.") The NJCRA is the state law analog to Section 1983 and a similar analysis applies. *See Monroe v. City of Hoboken*, No. 11-2556, 2012 WL 119177, at *11 (D.N.J. Apr. 10, 2012).

Art. I § 22 of the New Jersey State Constitution states, in part, "[a] victim of a crime shall be treated with fairness, compassion and respect by the criminal justice system." It defines a "victim," in part, as: "a person who has suffered physical or psychological injury or has incurred loss or damage to personal or real property as a result of a crime." *Id.*

The Court construes the Amended Complaint as alleging a New Jersey State Constitution violation and seeking damages under the NJCRA. Like Section 1983, the NJCRA is merely the mechanism for enforcing rights under the constitution and is not an independent source of rights. *See Martin*, 965 F. Supp. 2d at 548. Although the Amended Complaint does not specify the NJCRA as the specific mechanism to secure damages, it clearly attempts to allege a New Jersey State Constitution violation, which can only give rise to damages pursuant to the NJCRA. *See id.* The Borough was clearly on notice of this as it identifies the NJCRA as the applicable statute in its motion. Borough Mot. at 17. Therefore, construing the Amended Complaint liberally, the

---

[11] Unlike for the federal constitutional claims, the Borough does not argue that the NJCRA claims fail because no policy or custom causing the injury has been alleged.

Court finds that Count IV is a claim for damages for violation of the VRA, brought under the authority granted in the NJCRA.

The Borough's only substantive argument against Count IV is that Plaintiff does not fit within the definition of "victim" in the VRA.  The Borough relies on a similar definition of "victim" taken from the Criminal Injuries Compensation Act of 1971, N.J.S.A. 52:4B-37,[12] and case law interpreting that definition.  Borough Mot. at 18.  The New Jersey Supreme Court has interpreted "victim" as used in that statute to be the "individual harmed by the crime for which the defendant was convicted."  *State v. Lawless*, 214 N.J. 594, 613 (2013).  Plaintiff responds by pointing out that the VRA defines "victim" separately and arguing that its definition is broader than that used in the Criminal Injuries Compensation Act of 1971.  Opp'n to Borough Mot. at 18-20.

The Court need not decide what definition of "victim" should apply here because the Court finds that the VRA was never intended to create a cause of action for a plaintiff to sue a municipality for failure to investigate and prosecute a crime.  The VRA was part of a "series of changes in the law [that] has steadily strengthened the rights of victims to *participate in criminal proceedings*."  *New Jersey v. Tedesco*, 214 N.J. 177, 195-96 (2013) (emphasis added).  Therefore, the "VRA addresses a criminal victim's rights during criminal proceedings."  *Kirby v. Borough of Woodcliff Lake*, No. 20-cv-01670, 2021 WL 5905712, at *5 (D.N.J. Dec. 14, 2021).  Here, Plaintiff does not allege that the Borough stripped her of rights due to her in Coirazza's criminal proceeding for the murder of her mother.  Rather, the allegations underlying Count IV are that CPD failed to investigate the complaints made by Plaintiff's parents and failed to charge Coirazza with sexual

---

[12] The Borough incorrectly sites the applicable section at N.J.S.A. 52:4B-1.  That section merely states the name of the Act.

crimes he allegedly committed against Plaintiff.  The Court is unaware of any cases applying the VRA in this context and finds that it was not intended to so apply.  Therefore, Count IV will be **DISMISSED** *without prejudice*.  Plaintiff may file a Second Amended Complaint to assert rights covered by the VRA that were violated in connection with a criminal proceeding if such rights are implicated.

### 3.  *The negligence claim, Count V, will proceed as to the Borough*

Count V alleges negligence against the Borough.  Am. Compl. ¶¶ 140-44.  The Borough argues that Count V should be dismissed because Plaintiff failed to comply with the requirements of the New Jersey Tort Claims Act.  Borough Mot. at 19-27.  Plaintiff argues that this notice requirement does not apply.  Opp'n to Borough Mot. at 22-24.  The Court agrees with Plaintiff that the notice requirement in the New Jersey Tort Claims Act does not apply.

The New Jersey Tort Claims Act provides, in relevant part, that a claimant is barred from recovering against a public entity if the claimant fails to file her claim with the public entity "within [90] days of accrual" of her claim, "except as otherwise provided in section 59:8-9 . . . ."  N.J.S.A. 59:8-8(a); *see Karczewski v. Nowicki*, 188 N.J. Super. 355, 357 (App. Div. 1982).  However, N.J.S.A. 59:8-3(b) provides, in relevant part, that the timing requirements in Section 59:8-8 "shall not apply to an action at law for an injury resulting from the commission of sexual assault, any other crime of a sexual nature, a prohibited sexual act . . ., or sexual abuse . . . ."

The Borough argues that Section 59:8-3(b) does not apply because there are no allegations of sexual abuse by any Borough employee.  Borough Mot. at 25-27.  The Court disagrees.  Under the Borough's reading, unless an employee of the Borough was the one who committed the sexual assault or abuse, Section 59:8-3(b) does not apply.  But the plain text of the statute does not support that reading.  As Plaintiff points out, the statute makes clear that its trigger is whether the claimant's *injury* results from a sexual assault or abuse.  It does not limit its applicability only to

*actions against* the perpetrator or his employer.  Here, Plaintiff alleges her injuries result from sexual abuse.  That Plaintiff alleges the Borough was negligent in failing to prevent those injuries ultimately perpetrated by non-parties does not change the nature of her injuries.

Plaintiff relies on *W.S. v. Hildreth*, 252 N.J. 506 (2023), to argue that its broader reading of Section 59:8-3 is appropriate since that case held that a plaintiff suing a school and its employees with allegations of sexual abuse did not have to comply with the notice requirement of the New Jersey Tort Claims Act.  As the Borough points out, however, the case is somewhat distinguishable.  In *Hildreth*, the claims were against a public school district for allegations of sexual abuse by one of its teachers.  Here, the allegations are against the Borough for failing to stop the sexual abuse.  However, the Court finds this distinction insufficient to warrant adopting the Borough's narrow reading of Section 59:8-3(b).  The *Hildreth* court did not make anything of this distinction; therefore, *Hildreth* does not counsel in favor of a narrow reading of the statute.  Indeed, in *Hildreth*, the plaintiff asserted a negligence claim against the school district based, in part, on the school district's alleged failure to prevent the sexual offenses committed by a third party.  First Amended Complaint, *W.S. v. Hildreth, et al.*, No. GLO-L-43-20 (N.J. Sup. Ct., Gloucester Cnty., L. Div., Dec. 19, 2023) ¶¶ 41-51.  Therefore, the Court finds that Section 59:8-3(b) applies here and limits the applicability of the notice requirement in Section 59:8-8(a).  As such, Count V will proceed against the Borough.[13]

---

[13] The Court notes that Plaintiff does not name as defendants the individual officers whose underlying actions are alleged to have given rise to the negligence claim.  It is not the Court's role to instruct Plaintiff how to litigate her case.  However, should Plaintiff wish to amend her complaint to name individuals who allegedly committed negligent conduct, such amendment would be permitted.

> 4.     *The CSAA claim, Count VI, will be dismissed as to the Borough*

Count VI of the Amended Complaint alleges that the Borough violated the CSAA.  Am. Compl. ¶¶ 145-59.  The Borough argues that this count fails to state a claim because it does not stand *in loco parentis* with respect to the Plaintiff, as the CSAA requires.  Borough Mot. at 27-29. The Court agrees.

The CSAA states, in relevant part, that "any . . . person standing *in loco parentis* who knowingly permits or acquiesces in sexual abuse by any other person also commits sexual abuse . . . ." N.J.S.A. 2A:61B-1(1).  Prior to December 2019, the CSAA included the requirement that the person be standing *in loco parentis* "*within the household.*"  *Hardwicke v. Am. Boychoir Sch.*, 188 N.J. 69, 86 (2006) (emphasis added).  *In loco parentis* literally translated means "'in the place of a parent'" and includes "'relating to, or acting as a temporary guardian or caregiver of a child, taking on all or some of the responsibilities of a parent.'"  *Id.* (citing *In Loco Parentis*, BLACK'S LAW DICTIONARY (8th ed. 2004)).

In December 2019, the CSAA was amended to remove "within the household," as a requirement, thus expanding the reach of the CSAA.  2019 N.J. Sess. Law Serv. Ch. 120 (Senate 477).  Plaintiff argues that this expansion included the relationship the Borough was alleged to have with Plaintiff.  Opp'n to Borough Mot. at 25-26.  However, while it is no longer required that that a CSAA defendant be part of the victim's household, it is still required that the defendant be standing *in loco parentis* in relation to the victim.  Although the CSAA has now expanded to certain settings outside of the household, such as schools, *e.g.*, *Doe on behalf of Doe v. Small*, 654 F. Supp. 3d 376 (D.N.J. 2023), neither the Court nor the parties are aware of any case finding that a borough or its police department stood *in loco parentis* under the CSAA.  The Court finds that the Borough was not standing *in loco parentis* here.  The facts alleged do not indicate that the Borough was standing in the place of a parent, guardian, or caregiver of Plaintiff during the times

in which the grooming or assault occurred. Therefore, Count VI will be **DISMISSED** *with prejudice* as to the Borough.[14]

### C. CPS's Motion Will Be Granted, in Part, and Denied, in Part

The Amended Complaint asserts a violation of Title IX, Am. Compl. ¶¶ 123-29, negligence, *id.* ¶¶ 140-44, and a violation of the CSAA, *id.* ¶¶ 145-59, against CPS. CPS argues that the claims should be dismissed because Plaintiff failed to comply with the New Jersey Tort Claims Act, that the negligence count fails to state a claim, that the Title IX count fails to state a claim, and that the CSAA claim should be limited to conduct that occurred after December 1, 2019. The Court finds that (1) the New Jersey Tort Claims Act does not apply, (2) Plaintiff states claims for negligence and a violation of Title IX with respect to conduct occurring on school property or during school hours; and (3) that the CSAA claim is limited to conduct on school property or during school hours that occurred after December 1, 2019.

### 1. *The notice requirement in the New Jersey Tort Claims Act does not apply*

Like the Borough, CPS argues that Plaintiff's failure to comply with the notice requirement in the New Jersey Tort Claims Act requires dismissal.[15] CPS Mot. at 13-20. Plaintiff argues that the notice of claim requirement in the New Jersey Tort Claims Act does not apply. D.E. 53 ("Opp'n to CPS Mot.") at 5-8. For the same reasons discussed *supra* with respect to the Borough, the Court finds that the notice requirement in the New Jersey Tort Claims Act does not apply to the claims asserted against CPS because N.J.S.A. 59:8-3(b), eliminating the notice requirement in

---

[14] This dismissal is with prejudice because the Court finds that amendment would be futile. *See Phillips*, 515 F.3d at 236.

[15] CPS does not appear to limit its New Jersey Tort Claims Act notice argument to specific counts. However, the notice requirement in the New Jersey Tort Claims Act "does not apply to federal and state constitutional claims because a state statute may not abrogate an individual's constitutional rights." *Cnty. Concrete Corp. v. Roxbury*, 442 F.3d 159 (3d Cir. 2006).

cases where Plaintiff's "injury" results from the "commission of a sexual assault, any other crime of a sexual nature, a prohibited sexual act . . . or sexual abuse . . .," applies here.

      2.     *The negligence claim, Count V, will proceed as to CPS to the extent it arises from conduct during school hours on school grounds*

Count V of the Amended Complaint alleges negligence by CPS.  Am. Compl. ¶¶ 140-44. CPS argues that it did not have a duty of care over Plaintiff regarding the conduct at issue since Coirazza's alleged abuse took place away from school.  CPS Mot. at 16-20.  The Court finds that CPS had a duty of care to protect Plaintiff from sexual grooming occurring during school hours on school grounds.

"Whether a duty of care exists is a question of law that must be decided by the court." *Jerkins ex rel. Jerkins v. Anderson*, 191 N.J. 285, 294 (2007).  A school district has a duty to supervise students within the district's care.  *See id.* at 296 ("School officials have a general duty to exercise reasonable supervisory care for the safety of students entrusted to them, and [are accountable] for injuries resulting from failure to discharge that duty.") (alteration in original) (internal quotation marks excluded).  School employees are expected to oversee students on school grounds.  *See Kibler v. Roxbury Bd. Of Educ.*, 392 N.J. Super. 45, 55 (App. Div. 2007) ("Teachers must at times be present to oversee students on school playgrounds and in hallways, classrooms, lunchrooms and auditoriums.")  This supervisory duty extends to "foreseeable dangers . . . that arise from the careless acts or intentional transgressions of others" and includes a duty to prevent unwanted sexual contact on school grounds.  *L.E. v. Plainfield Public Sch. Dist.*, 456 N.J. Super. 336, 347-48 (App. Div. 2018).

CPS argues that all sexual abuse took place off school grounds outside school hours.  CPS Mot. at 18-20.  Plaintiff argues that its negligence allegation against CPS stems from sexual grooming occurring on school grounds and, therefore, CPS had a duty of care to protect Plaintiff

against such grooming.  Opp'n to CPS Mot. at 8-11.  The Court agrees with Plaintiff.  Reading the Amended Complaint in the light most favorable to Plaintiff, CPS's understanding is too narrow. At least a portion of the abuse alleged in the Amended Complaint took place in and stemmed from activities at school.  Plaintiff alleges that a ninth-grade student at CHS led a pervasive "Satanic cult" at school, in which that student groomed Plaintiff (and others) for a sexual relationship with Coirazza.  Am. Compl. ¶¶ 12, 60.  Because CPS has a duty of care to supervise its students during the school day, Plaintiff is free to argue that it should have discovered and prevented the ninth-grader's cult and sexual grooming of Plaintiff at school.  Therefore, Count V will proceed only to the extent it is based on events occurring during school hours or on school grounds but will be **DISMISSED**, *in part*, *with prejudice* as to CPS to the extent it is based on events occurring outside of school hours and away from school grounds.[16]

### 3.   *Plaintiff states a Title IX claim as to conduct on school property*

Count II alleges a sexual harassment Title IX violation against CPS.  Am. Compl. ¶¶ 123-29.  CPS argues that the claim should be dismissed because (1) it had no control over Coirazza, (2) the sexual harassment alleged to have occurred in school is not severe enough to state a Title IX claim, and (3) the alleged sexual harassment was not unwelcomed by Plaintiff.  CPS Mot. at 21-28.  The Court finds that Plaintiff states a Title IX claim only to the extent the claim arises out of student-on-student harassment on school property.

To state a Title IX claim for student-on-student sexual harassment, a plaintiff must allege facts that, if true, establish the following elements: "(1) the defendant receives federal funds; (2) sexual harassment occurred; (3) the harassment occurred under 'circumstances wherein the recipient exercise[d] substantial control over both the harasser and the context in which the known

---

[16] This partial dismissal is with prejudice because the Court finds that amendment would be futile. *See Phillips*, 515 F.3d at 236.

harassment occur[red],' (4) the funding recipient had 'actual knowledge' of the harassment; (5) the funding recipient was 'deliberately indifferent' to the harassment; and (6) the harassment was 'so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school.'" *S.K. v. Allegheny Sch. Dist.*, 168 F. Supp. 3d 786, 800 (W.D. Pa. 2016) (quoting *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645, 650 (1999) (alteration in original)).

CPS concedes that it receives federal funds. CPS does not address whether Plaintiff alleges the actual knowledge or deliberate indifference prongs.[17] CPS first argues that Coirazza was the harasser and that it lacked control over him. The Court agrees with CPS that it lacked control over Coirazza, but the Amended Complaint alleges he did not act alone and that a ninth-grade student at CHS groomed Plaintiff, at school, for a sexual relationship with Coirazza. Am. Compl. ¶¶ 12, 60. Where the alleged "misconduct occurs during school hours and on school grounds," the school system has "significant control" over the harasser for purposes of Title IX. *Davis*, 526 U.S. at 646.

Although Plaintiff appears to argue that CPS's control extends over actions taken by Coirazza, its reliance on *Hall v. Millersville University*, 22 F.4th 397 (3d Cir. 2022) for that proposition is inapposite. In *Hall*, the court found that the university exercised control over a non-student guest in its dormitories because it, *inter alia*, maintained guest policies for its dormitories and it had removed the non-student guest on multiple occasions. *Id.* at 408. Here, it is not alleged that Coirazza ever stepped foot on school grounds. Therefore, the Title IX claim must be based on student-to-student harassment that occurred on school grounds. *See Davis*, 526 U.S. at 646.

CPS next argues that the sexual harassment alleged was not severe, pervasive, and objectively offensive for purposes of Title IX. CPS Mot. at 23-26. Plaintiff responds by arguing

---

[17] Therefore, the Court will not address these prongs. *See Hilburn*, 2010 WL 703202, at *13 n.23.

that her allegations are severe enough and that, alternatively, this issue is a question of fact not appropriate for a motion to dismiss.  Opp'n to CPS Mot. at 19.  The Court disagrees with Plaintiff that this is an impermissible question of fact but agrees that the allegations are sufficiently severe to state a Title IX claim.  Whether or not Plaintiff can ultimately prove her allegations is not the issue before the Court.  But those allegations must establish the elements of a Title IX violation, including that the harassment was "so severe, pervasive, and objectively offensive that it [could] be said to [have] deprive[d] the victims of access to the educational opportunities or benefits provided by the school."  *Davis*, 526 U.S. at 650.

To determine whether alleged harassment is "severe or pervasive," the "overall scenario" must be considered holistically.  *Abramson v. William Paterson Coll. Of New Jersey*, 260 F.3d 265, 276 (3d Cir. 2001).  The parties do not supply the Court with precedent that is factually analogous to this case and the Court is unaware of any.  However, viewing the facts in the light most favorable to Plaintiff, she was enmeshed in an in-school "Satanic cult" where she, amongst other minor girls, was groomed by a ninth grader for sexual relationships with Coirazza, an adult male.  Am. Compl. ¶¶ 12, 60.  Plaintiff was "egged on" by her peers to sexually engage with Coirazza.  *Id.* at 61.  This resulted in signs of depression, plummeting grades, failing classes, and broken family relationships.  *Id.* ¶¶ 18, 61-63.  It is true that the allegations of in-school harassment are not nearly as detailed as the allegations of out-of-school harassment by Coirazza.  To ultimately prevail, Plaintiff will have to prove these allegations and CPS will be entitled to test them, including by obtaining detailed discovery on these allegations.  But the Court finds that Plaintiff's allegations constitute a "short and plain statement," Fed. R. Civ. P. 8(a)(2), showing that the harassment endured by Plaintiff was sufficiently severe, pervasive, and objectively offensive.  That is all that is required at this juncture.

Lastly, CPS argues that the alleged harassment was not unwelcome by Plaintiff.  CPS Mot. at 26-28.  CPS concedes that Plaintiff alleges she was the "victim of student-to-student sexual harassment, perpetrated by members of her peer group who encouraged and facilitated her to take part in inappropriate sexual relationships, including the alleged sexual relationship that occurred with Coirazza," CPS Mot. at 24, but then seemingly contradicts that concession by arguing that the conduct Plaintiff endured at school was not unwelcome.  *See Lockhart v. Willingboro High Sch.*, No. 14-cv-3701, 2017 WL 4364180, at *5 (D.N.J. Sept. 29, 2017) (holding that "to constitute actionable sexual harassment under Title IX, the conduct at issue must first be unwelcome").  In any event, the Court finds that Plaintiff adequately alleges the sexual conduct alleged at school was unwelcome.

"Unwelcome sexual conduct . . . [is] a form of sexual harassment."  *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 708 (E.D. Pa. 2007).  Actions constituting sexual harassment may include any "verbal or physical conduct of a sexual nature."  *Stroehmann Bakeries, Inc. v. Local 776, Intern. Broth. of Teamsters*, 969 F.2d 1436, 1442 (3d Cir. 1992).  The alleged in-school "grooming" described *supra* is at least verbal conduct of a sexual nature.  Additionally, the Amended Complaint adequately alleges that the conduct was unwelcome.  The Amended Complaint repeatedly describes Plaintiff as a "victim" of the in-school grooming that occurred when Plaintiff was just thirteen years old.  Even if Plaintiff seemingly willingly engaged in sexual conduct, she might "nevertheless have lacked the legal capacity" to do so.  *Pottsgrove Sch. Dist.*, 501 F. Supp. 2d at 708; *see also Lockhart*, 2017 WL 4364180, at *5 ("'Assessment of 'welcomeness' depends on the age of the alleged victim and 'younger children' may not have 'the capacity to welcome sexual conduct' under any circumstances.'") (quoting United States Dep't of Educ. Office of Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by*

*School Employees, Other Students, or Third Parties* (Oct. 2015), https://perma.cc/8FQB-A2PE.) Because Plaintiff claims she was victimized by the alleged sexual grooming at school and because of her age at the time of the grooming, the Court finds that the Amended Complaint adequately alleges the sexual conduct was unwelcome.

Therefore, Count II will proceed to the extent it alleges student-on-student sexual harassment on school property but will be **DISMISSED**, ***in part***, ***with prejudice*** as to CPS only to the extent it is based on sexual harassment occurring outside of school hours.[18]

4.   *The CSAA claim is limited to conduct on school property or during school hours that occurred after December 1, 2019*

Count VI of the Amended Complaint alleges that CPS violated the CSAA.  Am. Compl. ¶¶ 145-59.  CPS argues that Count VI should be dismissed, in part, to the extent it is based on conduct occurring before December 1, 2019, when the CSAA was amended because the amendment does not apply retroactively, and the previous version does not cover the conduct alleged against CPS.  CPS Mot. at 29-32.  The Court agrees.

As discussed *supra*, the CSSA establishes liability for those standing *in loco parentis* who knowingly permit or acquiesce in sexual abuse by another.  *See* N.J.S.A. 2A:61B-1(1).  Before December 2019, the CSAA required that the person to be held liable must be "within the household" of the victim.  *Hardwicke*, 188 N.J. at 86.  As of December 1, 2019, though, the CSAA no longer required that the person be "within the household" of the victim.  *See* 2019 N.J. Sess. Law Serv. Ch. 120 (Senate 477).

CPS does not dispute that it stands *in loco parentis*.  Plaintiff argues that the CSAA covers the conduct alleged against CPS both before and after the amendment.  Opp'n to CPS Mot. at 11-

---

[18] This partial dismissal is with prejudice because the Court finds that amendment would be futile. *See Phillips*, 515 F.3d at 236.

28

16.   Therefore, the sole issue is whether the pre-December 1, 2019 "within the household" limitation in the CSAA limits Plaintiff's claims only to conduct occurring post December 1, 2019. The Court finds that Plaintiff's claims are so limited.  There is a long-standing general rule in New Jersey that "favors prospective application of statutes."  *Gibbons v. Gibbons*, 86 N.J. 515, 521 (1981).  When determining whether a statute applies retroactively, courts consider two questions: (1) "whether the Legislature intended to give the statute retroactive application," and (2) "whether retroactive application is an unconstitutional interference with vested rights or will result in a manifest injustice."  *Johnson v. Roselle EZ Quick LLC*, 226 N.J. 370, 387 (2016).

This court has already addressed the issue of whether the December 2019 amendment to the CSAA applies retroactively and found that it did not.  *Small*, 654 F. Supp. 3d at 402-03.  The Court finds the reasoning in *Small* persuasive and adopts it herein.  Plaintiff argues that the Court in *Small* erred because it did not discuss *Hildreth*, which, Plaintiff contends, finds that the December 2019 amendment does apply retroactively.  Plaintiff does not persuade.  In *Hildreth*, the New Jersey Supreme Court discussed the retroactive application of the notice requirement of the New Jersey Tort Claims Act and the statute of limitations for, inter alia, the CSAA—not the "within the household" language that was removed by the 2019 Amendment to the CSAA.  252 N.J. at 512, 522.  In fact, *Hildreth* found that the New Jersey Tort Claims Act notice requirement was correctly applied *prospectively* by the lower court.  *Id.* at 521-22.

As the Court in *Small* found, the legislative history demonstrates that the Legislature intended for the 2019 Amendment to the CSAA to apply prospectively.  *See Small*, 654 F. Supp. 3d at 402 (citing S. Judiciary Comm. Statement for S.B. No. 477-L.2019, March 7, 2019 (available at https://perma.cc/2W5Y-4VYY) (stating that the removal of "in the household" from the CSAA is "intended to apply prospectively")).  Where the "'Legislature has clearly spoken,'" as it has

29

here, "'it is the privilege of that body to establish public policy . . . the judiciary must not ignore the policy . . . on the ground that it[s] views differ with those plainly expressed by the Legislature.'" *Small* 654 F. Supp. 3d at 403 (quoting *Ayres v. Dauchert*, 130 N.J. Super. 522, 531-32 (Sup. Ct. App. Div. 1974)).  Moreover, as Plaintiff points out, its CSAA allegations against CPS span both before and after December 1, 2019—applying the 2019 Amendment prospectively here, as the Legislature intended, does not deprive Plaintiff of justice.  Therefore, Count VI will proceed as to CPS only to the extent it is based on conduct after December 1, 2019.  Count VI will be **DISMISSED**, *in part*, *with prejudice* as to CPS to the extent it is based on conduct prior to December 1, 2019.[19]

## IV.    CONCLUSION

For the reasons set forth above, BCPO's motion will be **GRANTED**; the Borough's motion will be **GRANTED**, *in part*, **and DENIED**, *in part*; and CPS's motion will be **GRANTED**, *in part*, **and DENIED**, *in part* as follows:

- The Amended Complaint will be **DISMISSED** in its entirety, *without prejudice*, as to the BCPO.

- Count I (unspecified violation of Section 1983) will be **DISMISSED** *without prejudice* as to the Borough.

- Count II (violation of Title IX) will proceed only to the extent it is based on student-to-student harassment that occurred on school grounds.  Count II will be **DISMISSED**, *in part*, *with prejudice* to the extent it is based on activities off school grounds.

---

[19] This partial dismissal is with prejudice because the Court finds that amendment would be futile. *See Phillips*, 515 F.3d at 236.

- Count III (violation of the Fifth Amendment) will be **DISMISSED** *without prejudice* as to the Borough.

- Count IV (violation of N.J. Const. Art. I § 22) will be **DISMISSED** *without prejudice* as to the Borough.

- Count V (Negligence) will proceed only to the extent it is based on conduct that occurred on school grounds or during school hours.  Count V will be **DISMISSED**, *in part*, *with prejudice* to the extent it is based on activities off school property and outside school hours.

- Count VI (violation of the CSAA) will be **DISMISSED** *with prejudice* as to the Borough. Count VI will proceed as to CPS only to the extent it is limited to conduct on school property or during school hours that occurred after December 1, 2019.  Count VI will be **DISMISSED**, *in part*, *with prejudice* as to CPS to the extent it is based on conduct not occurring on school property and during school hours and conduct that occurred prior to December 1, 2019.

Dated: August 19, 2024

Evelyn Padin, U.S.D.J.